AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One Alcatel Cellular Phone
Model No. 1066G
FCC ID: 2ACCJBO98

Case No.

SEP 19 2019

'19 MJ 4058

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein)

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 952, 960, and 963; 21 U.S.C. Secs. 841 and 846; 21 U.S.C. Secs. 843(b) | Import. of CS ( and Conspiracy); Distr. and Poss. with Intent to Distr. CS (and Conspiracy); and Unlawful Use of a Communication Facility |

The application is based on these facts:

See attached Affidavit (incorporated herein)

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Guillermo Diaz, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/19/19

_____
*Judge's signature*

City and state: San Diego, California

Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>One Alcatel Cellular Phone<br>Model No. 1066G<br>FCC ID: 2ACCJBO98 | **AFFIDAVIT OF SPECIAL AGENT GUILLERMO DIAZ IN SUPPORT OF A SEARCH WARRANT** |

I, Special Agent Guillermo Diaz, having been duly sworn, declare and state as follows:

## I.

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic devices:

> Alcatel Cellular Phone
> Model No. 1066G
> FCC ID: 2ACCJBO98
> (**Target Device**)

and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance (and Conspiracy to do the same); Title 21, United States Code, Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the same); and Section 843(b), Unlawful Use of a Communication Facility (the **Target Offenses**).

2. The **Target Device** was seized from Defendant Andrianna Perez (**Defendant**) at the time of her arrest for Importation of Methamphetamine on August 7, 2019, at the San Ysidro Port of Entry. The **Target Device** was found in Defendant's vehicle at the time of her arrest. The **Target Device** is currently stored in the vault located at 2255 Niels Bohr Court, in San Diego, California.

3. The search of the **Target Device** supports an investigation and prosecution of Defendant for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the **Target Device**, as described in Attachment A will produce evidence of the Target Offenses, as described in Attachment B.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II
## AFFIANT'S EXPERIENCE AND TRAINING

5. I am a Special Agent (SA), with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed by HSI as a Special Agent since February of 2011. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC), where I received training on conducting federal criminal investigations, including, but not limited to, the gathering of evidence, preservation of a crime scene, and the use of electronic evidence. I am currently assigned

to HSI's Contraband Smuggling Group in San Diego, California. My current responsibilities include investigating narcotics smugglers.

6. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

7. My training and experience in narcotics enforcement has included narcotics interdiction, the identification of different types of narcotics, including methamphetamine, and the investigation of persons in possession of narcotics for purposes of sales and transportation. In addition, I speak regularly with narcotics investigators at the federal, state and local level regarding the manner in which sellers of narcotics store, transport and sell narcotics.

8. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

9. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use cellular/mobile telephones, in part, because these individuals believe law enforcement is unable to track the phone numbers of calls placed to and from cellular/mobile telephones.

10. Based upon my training and experience as an HSI Special Agent, my participation in the investigation of narcotic organizations, and consultations with law enforcement officers experienced with narcotic trafficking investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

    a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, email, Internet, social networking websites, and voice messages.

    b. Drug smugglers believe that cellular telephones provide greater insulation and protection against court-ordered wiretaps, and they believe in the inability of law enforcement personnel to simultaneously track the originating and destination telephone numbers of calls placed to and from their cellular telephone.

    c. Drug smugglers will use cellular telephones because they are able to monitor the progress of their illegal cargo while the conveyance is in transit.

    d. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations to facilitate the further distribution of their illegal cargo within the United States.

    e. Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    f. Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity, including the presence and location of marked and unmarked units, as well as the operational status of Border Patrol checkpoints or Ports of Entry within the United States.

    g. The use of cellular telephones by drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

11. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, through my training and education, that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

    a. tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States, and to distribute methamphetamine or other federally controlled substances within the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation or distribution of methamphetamine, or other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in the importation or distribution of methamphetamine, or other federally controlled substances from Mexico into the United States;

5

   d. tending to identify travel to or presence at locations involved in the importation or distribution of methamphetamine, or other federally controlled substances from Mexico into the United States;

   e. tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## STATEMENT OF PROBABLE CAUSE

**A. DEFENDANT'S ARREST**

13. On August 7, 2019, at around 7:45 a.m., Defendant Andrianna Perez applied for entry into the United States at the San Ysidro Port of Entry. She was the driver, registered owner, and sole occupant of a white 2001 GMC Sonoma bearing California license plate 82274S2.

14. Customs and Border Protection Officer (CBPO) Daluz was conducting a pre-primary operations during this time. CBPO Daluz approached Defendant's vehicle, spoke to her about where she was going, and received two negative oral declarations from Defendant. CBPO Daluz asked Defendant if she owned the vehicle she was driving, and she stated she owned the vehicle, but was going to San Diego to get the registration "situated." CPBO Daluz noticed Defendant appeared to be nervous, so he called for CBPO Perez and his trained Human-Narcotics Detection Dog (HNDD).

15. While screening the vehicle, CBPO Perez's HNDD alerted to the inside the cab of the truck. CBPO Daluz inspected the area underneath the truck's bench seat and discovered packages. Defendant was then escorted to the security office the truck was sent to an area for further inspection. Before the truck arrived in the secondary inspection area, it was scanned using a Z-Portal machine. CBPO Parrilla reviewed the scanned images and noticed anomalies in the area behind the driver's seat.

16. In the secondary inspection area, CBPO Dominguez conducted a physical inspection of the truck. He discovered a total of twenty-six (26) packages: two (2) packages under carpeting, three (3) packages under the driver's seat, and twenty-one (21) packages behind the seat on the rear panel wall covered by fabric. Seventeen packages contained a substance that field tested positive for the properties of methamphetamine and weighed a total of 8.22 kilograms (18.12 lbs.). The other nine packages were identified as sodium bicarbonate by a field test and weighed a total of 9.08 kilograms (20.01 lbs.). I suspect a more complete analysis of the substance that field-tested as containing sodium bicarbonate will reveal that it is actually fentanyl. CBPO Dominguez also removed the **Target Device** during his search of Defendant's vehicle and seized it.

B. **DEFENDANT'S POST-*MIRANDA* STATEMENT**

17. After her arrest, Defendant was advised of her *Miranda* rights. She elected to waive them and make a statement.

18. Defendant said she was going to the San Diego to get her job back and go to the California Department of Motor Vehicles.

19. Defendant stated that two individuals named "Oscar" and "Anthony" attempted to recruit her to smuggle drugs across the border, and are known to recruit drivers to smuggle drugs. Defendant stated that she agreed to transport money across the border, but did not agree to smuggle drugs.

20. Defendant stated that she did not look in the vehicle prior to driving it, but has checked the vehicle's cab when driving the truck on prior occasions.

21. Defendant stated she was crossing the border in the truck regularly because she wanted to cross enough times so she would stop being referred for secondary inspection.

C. **DEFENDANT'S BORDER CROSSING HISTORY**

22. Defendant crosses the border fairly frequently. Defendant appears to have crossed the border almost exclusively through the pedestrian lanes up until around June 7, 2019 (two months prior to her arrest). After June 7, 2019, she crossed the border almost

7

exclusively in the white GMC Sonoma truck she was driving on the day of her arrest. She crossed the border into the United States in the GMC Sonoma truck a total of nine (9) times, including the day of her arrest.

23. Defendant stated in her Post-*Miranda* interview that she started crossing the border in the truck regularly so she would stop getting sent to the secondary lot for review by CBP (*i.e.*, she was "burning the plates").

24. Further, once Defendant began crossing the border in the truck, it appears she often entered the United States and then only stayed for a short period of time before driving the car back south into Mexico.[1] For example, on July 31, 2019, Defendant entered the United States in the truck at approximately 8:56 p.m. and then the truck drove back into Mexico at around 9:32 p.m. (approximately 36 minutes later). Similarly, on July 9, 2019, Defendant drove the GMC truck into the United States around 9:02 p.m. and then the truck drove back into Mexico around 9:14 p.m. (approximately 12 minutes later). These short trips into the United States are consistent with an individual who is crossing the border solely for the purpose of establishing a crossing history with a vehicle.

25. Based on my experience investigating narcotics smugglers, Defendant may have used the **Target Device** to coordinate with the other parties involved regarding the importation of methamphetamine. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the **Target Device**. This data may include information that is relevant to Defendant's narcotics trafficking activities, including identifying other persons involved in their narcotics trafficking activities.

26. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into

---

[1] The available crossing records only indicate the white GMC truck drove back south into Mexico. I am operating under the assumption that Defendant was the person driving the truck back south.

8

the United States. All parties involved communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. Accordingly, probable cause exists to believe that evidence of the aforementioned offense exists on the **Target Device** for the period of May 7, 2019 through August 7, 2019.

## III
## METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device**

9

and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## IV
## CONCLUSION

30. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Defendant utilized the **Target Device** to facilitate the commission of the Target Offenses.

31. Given the dates when Defendant's crossing patterns shifted from crossing via the pedestrian lanes, to crossing the border in a vehicle, to crossing the border in the Truck, probable case exists to believe that evidence of aforementioned offenses exists on the **Target Device** from the period of May 7, 2019 to August 7, 2019.

32. Because the **Target Device** was promptly seized during the investigation of Defendant's drug trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activity committed by Defendant continues to exist on the **Target Device**.

//
//
//
//
//
//
//

33. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Special Agent Guillermo Diaz
Homeland Security Investigations

Sworn to and subscribed before me this __19__ day of September, 2019.

HON. WILLIAM V. GALLO
UNITED STATES MAGISTRATE JUDGE

11

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following property is to be searched in connection with an investigation of violation of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance (and Conspiracy to do the same); Title 21, United States Code, Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the same); and Section 843(b), Unlawful Use of a Communication Facility:

Alcatel Cellular Phone
Model No. 1066G
FCC ID: 2ACCJBO98
(**Target Device**)




The **Target Device** is currently in the possession of the Department of Homeland Security, Homeland Security Investigations as evidence and is being stored in the vault located at 2255 Niels Bohr Court, in San Diego, California.

## ATTACHMENT B

Authorization to search the **Target Device**, described in Attachment A, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of May 7, 2019 to August 7, 2019:

    a.    tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States, and to distribute methamphetamine or other federally controlled substances within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation or distribution of methamphetamine, or other federally controlled substances from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States, and/or the distribution of methamphetamine or other federally controlled substances within the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States, and/or and the distribution of methamphetamine or other federally controlled substances within the United States;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance (and Conspiracy to do the same); Title 21, United States Code, Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the same); and Section 843(b), Unlawful Use of a Communication Facility.